**BETTS & WRIGHT, A Professional Corporation**
Attorneys at Law
P.O. Box 28550
Fresno, California 93729-8550
Telephone: (559) 438-8500
Facsimile:  (559) 438-6959

James B. Betts (State Bar #110222)
Joseph D. Rubin (State Bar #149920)

Attorneys for Plaintiff CYPRESS AVENUE PARTNERS LLC

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| CYPRESS AVENUE PARTNERS LLC | ) | Case No. 08-002374 MEJ |
| Plaintiff, | ) | |
| v. | ) | **DECLARATION OF RICARDO I. RAMIREZ IN OPPOSITION TO MOTION TO DISMISS** |
| AXION POWER INTERNATIONAL, INC.; JOHN GRANVILLE; JOHN PETERSON; and DOES 1-50, inclusive, | ) | Date:    August 7, 2008<br>Time:    10:00 am<br>Ctrm:    B, 15th Floor<br>         450 Golden Gate Ave. |
| Defendants. | ) | Judge:  The Honorable Maria-Elena James |

I, RICARDO I. RAMIREZ, declare:

1.  I am an individual who resides in Tahoe City, California, and am the managing member and owner of Cypress Avenue Partners, LLC., Plaintiff herein, ("Cypress Avenue Partners").  Cypress Avenue Partners is a limited liability company which was formed in the State of Nevada, and which is qualified to do business in the State of California.  All of the facts set forth in this declaration are true and correct, of my own person knowledge, and if called as a witness, I could and would competently testify to all matters set forth herein.

2.  In early 2007, I was contacted by John Petersen, who was an

1   attorney at law that had previously served as my attorney in legal matters.  From

2   our work together, Mr. Petersen knew that I was a consultant who specialized in

3   assisting troubled businesses.  Mr. Petersen explained that he was on the Board of

4   Directors of Axion Power International, Inc., which was experiencing financial

5   difficulties, and needed my services to assist in turning around the performance of

6   the company and ultimately making the company attractive to investors or

7   purchasers.  In our initial and ensuing conversations, Mr. Petersen was successful in

8   soliciting my agreement to provide consulting services on behalf of Axion Power,

9   and acted as my company's  attorney in negotiating a  consulting agreement with

10  Axion Power, a copy of which is attached hereto as Exhibit A.   Assuming Mr.

11  Petersen's repeated assurances that my interests would be protected, I would not

12  have agreed to enter into this contract with Axion.

13      3.    My company's written contract with Axion Power was executed by the

14  corporation's Chief Executive Officer, Thomas Granville.  In that agreement, Axion

15  Power acknowledged that the contract would be governed by the laws of the State

16  of California and that any dispute between the parties would be resolved by binding

17  arbitration in Sacramento, California. (Exhibit A, ¶8).

18      4.    Throughout the relevant time period, and based upon my conversations

19  with Mr. Petersen, I operated under the belief that Mr. Petersen was representing

20  my interests and the interests of Cypress Avenue Partners in this transaction.

21  Attached hereto as Exhibit B is a true and correct copy of an e-mail I received from

22  Mr. Petersen dated November 19, 2007 in which he confirms his negotiation of my

23  contract.

24      5. From the date of Mr. Petersen's initial phone call, I worked closely with

25  numerous representatives of Axion Power in an effort to reposition the company as

26  from what was perceived to be a "tired pink sheet" company to a dynamic "green

27  technology" energy company.  I was actually engaged for over eighteen (18) months

28  exploring  relationships with potential financing sources as well a strategic partners

who may have an interest in the company's battery technology or battery production facilities.

6.    In 2006 and 2007, Axion faced many negative issues that precluded the company from being taken seriously by an investor.  They had serious problems with shareholder lawsuits, SEC compliance, out-of-date financials and the fall-out from Axion's bankruptcy.  One of the primary missions was to develop, test and get critical market and expert feedback that would allow Axion to shape a strategy and business plan that would be of interest to industry peers and investors.  Obviously, Axion had significant baggage that could, over time, be resolved, but in short term made Axion unattractive to the investment community.

7.    In or about February, 2007, numerous representatives of Axion Power, including the Board of Directors, Chief Executive Officer Thomas Granville and legal counsel, John Petersen (who at that time was also Chairman of the Board) were scheduled to travel to Los Angeles to receive a technology award from Frost & Sullivan.  I utilized this opportunity setup a small road show for Axion to meet with a reputable investor relations/public relations firm, two boutique investment banking firms and merchant banks that specialized in the lead acid/ battery storage sector and focus on the "clean-tech" green energy solutions sector.

8.    On February 7, 2006, the Axion team flew into Los Angeles to accept and award from Frost & Sullivan at an event held at the Disneyland Hotel.  Tom Granville and John Petersen requested my presence at the award meeting and dinner, stating that they thought that it was a great opportunity to meet the members of the Board of Directors and to prepare for our planned series of meeting. That day, the whole team of Axion's officers, directors and myself met and pitched Axion Corporate story and its unique technology to Craig Sultan at Merriman Curhan Ford and Co., ("Merriman") which had a focus on "green based technologies."  The following morning, February 8, 2007, John Petersen, Tom Granville, Ed Buiel and I met at the investment banking offices of B Riley in Newport Beach with Paul

1  Donnely, Vice President, and Greg Presson, Director of Investment Banking.

2  Additionally, during this time period, we also met in Southern California with Rob

3  Whetstone at Pondel-Wilkinson, a public and investor relations firm specializing in

4  public traded companies.  The focus of their work is to assist companies in

5  articulating and disseminating a positive business strategy.

6      9.    In my experience, California leads the nation in providing new and

7  emerging clean technologies.  As a result, much of my work for Axion in 2007 and

8  2008 consisted of providing strategic planning and assessment services which

9  included comprehensive analysis of Axion's core competencies and iIntellectual

10 properties that underlie its strategic initiatives.  I then worked directly with Axion's

11 principals in developing a business plan that reflected Axion's true potential for

12 growth.  This consulting work performed by Cypress allowed Axion to properly

13 position itself to investors as having innovative technology and a forward looking

14 management team that would be attractive to that portion of the investment

15 community that was interested in "clean-tech-green" business opportunities.

16 Throughout this process, Cypress lent its experience in developing a grown plan that

17 positioned the company away from a "dirty-lead acid battery" product to a clean-

18 green- new technology product that presented attractive growth prospects for

19 Axion.

20     10.    My work in California included attending numerous meetings and

21 conferences where I presented Axion and its technologies to the investment

22 community.  During this time period, I worked very closely with Tom Granville and

23 John Petersen in developing a nuts and bolts business strategy, financial modeling

24 and forecasting and the creation of a Private Placement Memorandum.  I would

25 speak with Tom Granville via phone at least once a week, and more frequently when

26 my work required his involvement.  Mr. Granville was actively involved with me in

27 planning meetings that allowed me to build the framework for those meetings and

28 the Private Placement Memorandum, as well as the due diligence investigation in

1   San Francisco.  During that period,  we made formal presentations on Axion's behalf

2   to a number of potential investors both within and outside California, including, but

3   not limited to:

4            February, 2007:    B. Riley -  Newport Beach, CA.

5                               Merriman Curhan Ford & Co. -  Newport Beach, CA

6                               Pondel-Wilkinson - Los Angeles, CA

7            April, 2007:       Wells Fargo Ventures - San Francisco, CA.

8                               U. S. Bank - San Francisco, CA.

9            October, 2007:     Merriman - San Francisco, CA

10           December, 2007:  The Quercas Trust - Los Angeles, CA

11           11.    Thereafter, I worked directly with Axion in all facets of its attempt to

12   secure financing, including working with the company on such matters as the

13   restatement of the company's financials for the years 2003-2006 and development

14   of a growth strategy.  These efforts led to the negotiation of a written agreement

15   between Axion Power and  Merriman, a true and correct copy of which is attached

16   as **Exhibit C.**  Pursuant to that agreement, Axion Power, once again, agreed to be

17   bound by California law, and specifically agreed to arbitrate any disputes under their

18   agreement in San Francisco, California.  (Exhibit C, ¶15).

19           12.    Following Axion Power's retention of Merriman, I remained extremely

20   active in facilitating the procurement of financing through alternative funding

21   sources.  Throughout this time period, the majority of my work was performed in

22   San Francisco, California, where Merriman is located.  This work included

23   discussions with potential lenders and investors which led to the successful

24   procurement of $18,000,000.00 in equity funding from The Quercas Trust of

25   Newport Beach, which is located in Southern California.  Following the negotiation

26   of Axion Powers' financing agreement with The Quercas Trust, Axion Power sent

27   numerous corporate representatives to San Francisco to conduct the "due diligence"

28   review of that transaction.  Axion's agreement with The Quercas Trust was

1  announced on Axion's own web-page, a true and correct copy of which is attached

2  as **Exhibit D.**

3       13.    Mr. Petersen undertook an even higher level of contact within

4  California, by contacting me in this State, negotiating a contract on Cypress' behalf

5  which was to be performed in this State and enforced pursuant to California law and

6  routinely communicated with me by phone 2 - 3 times a day, 3-4 days a week in

7  California regarding my efforts to secure alternative financing.

8       14.    As outlined above, over the last year of my work, I regularly

9  communicated with both Granville and Petersen concerning Cypress' written

10 contract, Merriman's written contract, restating Axion's financials for the years

11 2003 - 2006, developing a growth strategy for Axion, investigating possible sources

12 of equity funding, and to complete the successful procurement of $18,000,000.00

13 in equity funding from The Quercas Trust of Newport Beach, including the due

14 diligence requirements of that transaction.  In each instance, Granville and

15 Petersen's conduct was intended to, and did, direct my activities in California;

16 principally in San Francisco, California.  These efforts were successful in achieving

17 Defendants funding objectives, which were accomplished almost entirely through

18 efforts directed at California.

19       15.    Under the written contract between Cypress and Axion Power, Axion

20 agreed, among other things, to issue Cypress a warrant to purchase 200,000 shares

21 of common stock and to pay Cypress a fee of $50,000.00 upon the first closing of

22 a financing agreement, along with a success based fee of $900,000,00.  (Exhibit A,

23 Paragraph 3(ii)).  Attached as Exhibit E is an e-mail dated January 9, 2008 that I

24 received from John Petersen  representing that Thomas  Granville and Axion had

25 agreed to issue the promised warrant and pay, upon closing, the cash fee

26 ($50,000.00).  Similarly, attached as Exhibit F is a true and correct copy of

27 correspondence received by my successor legal counsel from Axion Power which

28 purported to transmit the promised warrant, and promising to pay the cash fee.

1  Unfortunately, the promised warrant was not delivered and the cash fee was not

2  paid.  Attached as Exhibit G is correspondence from my successor  legal counsel

3  requesting the warrant and the payment of the undisputed cash fee.  However,

4  neither Axion Power nor its legal counsel ever responded to this letter, and the

5  promised warrant and cash fee have never been received.

6          I declare under penalty of perjury pursuant to the laws of the State of

7  California that the foregoing is true and correct.

8          Executed this 21st day of July, 2008, at Fresno, California.

9

10

11          /s/

12                  RICARDO I. RAMIREZ

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A

JUN-12-2008  09:14        BETTS WRIGHT                           559 438 6959      P.03

10/09/2006  12:06    7168536128                                         PAGE  01/05
10/08/2006 11:33 FAX 5305810793                GALLAGHER                      ☒002
                                              TO TERMITE



October 5, 2006

Thomas Granville
Axion Power International Inc.
100 Caster Avenue
Woodbridge, Ontario
L4L 5Y9 Canada

Gentlemen:

    This letter sets forth an agreement as to the terms on which Axion Power International, Inc. (the "Company") would retain Cypress Avenue Partners, LLC. ("Cypress") as its financial advisor in connection with strategic planning, financings (the "Financings") that are pursued by the Company during the term of this agreement (defined below). The Financings are presently proposed to be up to $35 million. The Company is seeking a $10 million private financing to provide funding for capital projects and an additional $15 to $25 million in public financing to complete demonstration testing with prospective customers, expand production facilities, expand marketing efforts and finance the Company's general working capital requirements. The Financings may include equity or convertible debt financing (an "Equity Financing") or a non-convertible debt financing (a "Debt Financing"). Additional definitions applicable to this letter are set forth below.

    With respect to the foregoing, Cypress and the Company agree as follows:

    1.    Cypress will provide the Company advisory services in connection with the Financings and the Strategic Alliances. In that connection Cypress will assist the Company in the preparation of information documentation as to the Financings and the Strategic Alliances, including a financing request to be submitted on a best efforts basis to Funding Sources or Intermediaries (defined below).  The Company shall provide Cypress all information, financial or otherwise, requested by Cypress for producing such information documentation. Cypress will prepare a valuation analysis valuing the business of Company.
Cypress will assist and consult with the Company in its preparation of a business plan, including five years of financial projections, an industry analysis applicable to the appropriate industry, and other appropriate information documentation in connection with the Financings and the Strategic Alliances.

JUN-12-2008  09:14        BETTS WRIGHT                        559 438 6959    P.04

10/09/2006  12:06    7168536126                                          PAGE  02/05
10/06/2006 11:34 FAX 5305810785           GALLAGHER           @003
                                          TC TERMITE

Cypress will act as a finder on a best efforts basis for potential parties to fund the Financings ("Funding Sources") and intermediaries through which the Financings would be funded. As a finder Cypress would introduce the Company to candidates for Funding Sources and Intermediaries, and the Company would negotiate the terms of the Financings with such candidates. Cypress will notify the Company in writing as to the identity of any person that is a potential Funding Source or Intermediary to which Cypress has introduced the Company. Each such person is referred to herein as a "Registered Funding Source" or "Registered Intermediary," respectively. Cypress makes no promises to the Company as to whether or not his introductions will result in the closing of a Financing. Within 3 days of receipt of any Cypress introduced candidates, the Company will either accept or reject such candidate. Acceptance by the Company of a Cypress candidate is an acknowledgment by the Company that such candidate was previously unknown to them and that no other financial intermediary working with the Company has identified such candidate for the Company.

The Company will conduct all negotiations, establish all terms and conditions, and furnish all disclosure materials to the Funding Sources, which disclosure materials the Company represents to Cypress shall be materially accurate and not misleading. In connection with a Transaction, the Finder will not: (a) be involved in any negotiations with the Buyers; and (b) make any recommendations regarding the Securities.

2.    The term of Cypress hereunder (the "term of this agreement") shall extend from the date the Company accepts this letter through 6 months thereafter and any period of time after such 6-month period during which a Financing is being negotiated with a Registered Funding Source or a Registered Intermediary. Cypress's appointment hereunder shall be non-exclusive and the Company expressly reserves the right to engage other finders, brokerage firms and intermediaries to assist the Company in its efforts to obtain the Financings during the term of this agreement.

3.    Cypress's compensation for its services rendered hereunder shall be as set forth below. The Company shall have the right in its discretion to accept or reject any Financing presented to the Company by a Registered Funding Source or a Registered Intermediary.

(i)    Upon execution of this Agreement, the Company shall issue Cypress a warrant to purchase 200,000 shares of the Company's common stock at an exercise price of $3 per share. The warrant shall include such terms and conditions, including cashless exercise rights, piggy-back and demand registration rights and full-ratchet anti-dilution protection, as are typical in transaction of the type contemplated by this Agreement

JUN-12-2008  09:14          BETTS WRIGHT                    559 438 6959    P.05

10/09/2006  12:06    7168536128                    GALLAGHER                  PAGE  03/05
10/06/2006 11:35 FAX 6305810785              TO TERMITE                    Ø004

(ii)    Upon the first closing of an Equity Financing or Debt Financing of at least $2 million with a Registered Funding Source or through the efforts of a Registered Intermediary introduced by Cypress, the Company shall pay Cypress a fee of $50,000, which may be offset against the contingent compensation specified in subparagraph (iii) below.

(iii)    If during the term of this agreement or within one year thereafter an Equity or Debt Financing is completed with a Registered Funding Source or through a Registered Intermediary the closing of such Financing, the Company will pay Cypress a cash fee of 5% of any equity plus 2% of any debt.

(iv)    In the event that Cypress has contracted or made arrangements with another person or entity regarding any financing candidates (a "Sub Intermediary"), then Cypress will be responsible for making any agreed upon payment to such sub-intermediary and Cypress will indemnify and hold harmless the Company from any claims from such contracted Sub-Intermediary.

(v)    If, after the end of the period specified in paragraph 2, another paid finder, broker or consultant negotiates a transaction between the Company and a Registered Funding Source or Intermediary that declined a transaction with the Company when Cyprus made the introduction, then the compensation specified in subparagraph (iii) will be divided between Cypress and such other finder, broker or consultant in such ratios as Cypress and such other party may agree. In the event that Cypress and such other party are unable to reach a mutually acceptable agreement, then Cypress agrees that the funding source or and the company shall have the right to allocate the compensation among the parties who claim an interest therein.

4.    The Company will reimburse Cypress upon submission of statements for Cypress's reasonable out-of-pocket expenses in connection with its rendering advisory services hereunder.  As a condition to reimbursement of expense items totaling in excess of $250, Cypress shall obtain approval from the Company prior to incurring any such particular expense item.

5.    As used in this letter, the following terms shall have the meanings set forth below.  Defined terms herein may be used in the singular or plural or other word forms as the context requires.

"Affiliate" shall mean, with respect to any person, any other person directly or indirectly controlling, controlled by, or under common control with, such person.  A person shall be deemed to control another person if such person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other person, whether through the ownership of voting securities, by contract or otherwise.

JUN-12-2008  09:14         BETTS WRIGHT                                 559 438 6959      P.06

10/09/2006  12:06    7168536129                     GALLAGHER                      PAGE  04/05
10/08/2006 11:28 FAX 5305810795              TO TERMITE                   @005

"Company" shall include any affiliate of the Company, its successors or assigns.

"Financing" shall include any financing or other transaction pursued by the Company during the term of this agreement, including any strategic alliance or joint venture that is comparable to a financing, irrespective of structure or amount, and shall include any stage or installment of any such financing or other transaction.

"Person" shall mean any individual, or any partnership, joint venture, firm, corporation, association, trust or other enterprise.

"Registered Funding Source" shall include any affiliate of a Registered Funding Source.

"Registered Intermediary" shall include any affiliate of a Registered Intermediary.

6.      As further consideration for this engagement, Company agrees to (a) indemnify and hold harmless Cypress and his affiliates, and their respective officers, directors, employees, agents, contractors and representatives (Cypress and each such entity or person being referred to as an "Indemnified Person"), from and against any and all losses, claims, demands, damages or liabilities of any kind arising out of or in connection with the services provided by Cypress hereunder, and (b) reimburse each Indemnified Person for all reasonable costs and expenses (including reasonable fees and disbursements of counsel) incurred by such Indemnified Person in connection with investigating, preparing or defending any investigative, administrative, judicial or regulatory action or proceeding relating to or arising out of the services contemplated by this letter agreement, as such costs and expenses are incurred or paid; except in either case to the extent such losses, claims, demands, damages, liabilities, costs or expenses are finally judicially determined to have resulted primarily from the gross negligence or willful misconduct of Cypress. Company also agrees that no Indemnified Person shall have any liability to Company or any of its security holders or creditors arising out of or in connection with the services to be provided under this letter agreement, except to the extent any such liability is finally judicially determined to have resulted primarily from the gross negligence or willful misconduct of such Indemnified Person..

7.      Under no circumstances shall Cypress be liable to Company with respect to any matter contemplated by this letter agreement for indirect, incidental, consequential, special or punitive damages (even if Company has been advised of the possibility of such damages), and in no event shall Cypress' liability arising out of or relating to this Agreement exceed the aggregate amount of fees actually received by Cypress from Company in connection with the

JUN-12-2008  09:15        BETTS WRIGHT                                         559 438 6959      P.07

10/09/2006  12:06    7169536128                GALLAGHER                            PAGE  05/05
10/00/2006  11:37 FAX 5505810788               TC TERMITE                           @000

services contemplated hereunder. Except as expressly set forth in this letter agreement, Cypress makes no representations or warranties whatsoever, either express or implied.

     8.    This agreement shall be governed by the laws of the State of California. Any dispute between the parties hereto arising out of this agreement shall be resolved by binding arbitration in Sacramento, California pursuant to the rules of the American Arbitration Association.

     If the foregoing sets forth the basis on which the Company would engage Cypress to perform advisory services as described above, please execute this letter in the space provided below for that purpose and return a signed copy (or a copy or facsimile thereof) to the undersigned, whereupon this letter shall constitute a binding agreement between the Company and Cypress as of the date of acceptance thereof.

Very truly yours,

Ricardo I. Ramirez
Cypress Avenue Partners, LLC

Accepted and agreed
to this __9th__ day of
October 2006.

Axion Power International, Inc.

By:
    Thomas Granville, Chief Executive Officer

EXHIBIT B

## Debbie

**From:** "Rick Ramirez" <Rickr43@earthlink.net>
**To:** "Tomer Tal" <tomer@newventureattorneys.com>
**Sent:** Saturday, March 29, 2008 1:33 PM
**Subject:** FW: Cypress engagement

Part of the time line that disputes that I have not tried to work this out with them....and their continued delays.
--
Ricardo I. Ramirez
Cypress Avenue Partners, LCC
P.O. Box 8089
Tahoe City, CA 96145
rickr43@earthlink.net
775-691-9335 (o/m)
530-581-3963 fax

Mailing address:
9900 Wilbur May Parkway, #705
Reno, Nevada  89521


------ Forwarded Message
**From:** Ricardo Ramirez
**Date:** Mon, 19 Nov 2007 19:28:00 -0800
**To:** 'John Petersen'
**Subject:** RE: Cypress engagement

John:

I appreciate your concern....however, if we have an issue let's figure it out now. There is way too much going on for this to become a distraction...given that I took this project at difficult time for the company, without a retainer and your assurances that we were working with a high integrity group....that will always do the right thing.   That is why I offered another alternative that gets everyone comfortable.  I gotta jump on the phone with Granville shortly...let's connect tomorrow @ 9:00 PST.



Ricardo I. Ramirez
Cypress Ave. Partners, LLC
rickr43@earthlink.net
P.O. Box 8089
Tahoe City, CA  96145
775 691-9335 (o/m)
530 581-3963 (f)

---

**From:** John Petersen [mailto:jlp@ipo-law.com]
**Sent:** Monday, November 19, 2007 11:17 AM
**To:** Ricardo Ramirez
**Subject:** Re: Cypress engagement

Rick,

I had no trouble negotiating your initial engagement a year ago while I was chairman of Axion's board and their lead counsel for almost everything. At this point I have no authority from a corporate perspective and while they listen to my advice, I really feel uncomfortable about wearing a negotiating hat for either you or Axion, particularly now that we're off into territory that wasn't contemplated by the original agreement.

I value my relationship with you and I value my relationship with Axion. I can see nothing but bad things happening to me if I end up in the middle. You gotta help me out here man.

John L. Petersen, partner

Fefer Petersen & Cie

Attorneys at Law

Château de Barberêche <http://www.swisscastles.ch/Fribourg/barbereche.html>

Switzerland 1783 Barberêche

4126-684-0500 Telephone

4126-684-0505 Facsimile

4179-308-5181 Cellular

US Voicemail and Fax

(281) 596-4545 Houston

(212) 401-4750 New York

NOTICE: This communication (including attachments) is covered by the Electronic Communication Privacy Act, U.S.C. Sections 2510-2521, is confidential, may contain privileged information and may be the subject of certain Confidentiality or Nondisclosure Agreements. If you are not the intended recipient or believe that you have received this communication in error, please e-mail, fax or telephone the sender immediately and delete this e-mail communication. Please do not print, copy, retransmit or otherwise duplicate, disseminate or otherwise use this information.

7/15/2008

No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.503 / Virus Database: 269.16.0/1139 - Release Date: 11/19/2007 12:35 PM


No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.503 / Virus Database: 269.16.0/1139 - Release Date: 11/19/2007 12:35 PM


------ End of Forwarded Message

EXHIBIT C



**MERRIMAN CURHAN FORD & CO.**

*GROW WITH US*℠

November 14, 2007

*PERSONAL & CONFIDENTIAL*

Mr. Thomas Granville
Chief Executive Officer
Axion Power International, Inc.
3601 Clover Lane
New Castle, PA 16105

Dear Thomas:

Merriman Curhan Ford & Co. ("MCF&Co.") is pleased to act as exclusive financial agent to Axion Power International, Inc. (the "Company"). We will provide investment banking services to the Company which includes representing the Company in its efforts to obtain financing in the form of a private investment, whether in one or a series of transactions, in either (a) public equity, or (b) convertible debt or equity, equity linked securities or any other securities (a "Capital Raising Transaction").

1.    <u>Services</u>. In connection with this engagement, MCF&Co. will perform the following services:

a.    <u>Capital Raising Services.</u> MCF&Co. will assist the Company in its capital raising efforts. MCF&Co. will introduce the Company to potential investors who may have an interest in financing the Company and will advise the Company with respect to the proposed structure, terms and conditions of the financing. MCF&Co. will clear any potential investors with the Company. MCF&Co. will prepare the Company for investor meetings, management presentations, responses to requests for data and other activities. MCF&Co. will assist the Company in managing the process of negotiating and closing the financing. This includes reviewing all proposals from potential financing sources, analyzing the terms of such proposals and participating in presentations to the Company's Board of Directors regarding any proposals, as well as reviewing of the transaction documentation and other closing activities. The Company is free, at its sole discretion, to accept or reject the terms of any proposed financing.

2.    <u>Information Provided to MCF&Co.</u> In connection with our engagement, the Company has agreed to furnish to MCF&Co., on a timely basis, all relevant information needed by MCF&Co. to perform its services under the terms of this agreement. During our engagement, it may be necessary for us: to interview the management of, the auditors for, and the consultants and advisors to, the Company; to rely (without independent verification) upon data furnished to us by them; and to review any financial and other reports relating to the business and financial condition of the Company as we may determine to be relevant under the circumstances. To this end, the Company will make available to us such information as we may request, including information with respect to the assets, liabilities, earnings, earning power, financial condition, historical performance, future prospects and financial projections and the assumptions used in the

**Axion Power International, Inc.**
**November 14, 2007**
**Page 2**

development of such projections of the Company. We agree that all nonpublic information obtained by us in connection with our engagement will be held by us in strict confidence and will be used by us solely for the purpose of performing our obligations relating to our engagement.

We do not assume any responsibility for, or with respect to, the accuracy, completeness or fairness of the information and data supplied to us by the Company or its representatives. In addition, the Company acknowledges that we will assume, without independent verification, that all information supplied to us with respect to the Company will be true, correct and complete in all material respects and will not contain any untrue statements of material fact or omit to state a material fact necessary to make the information supplied to us not misleading. If at any time during the course of our engagement the Company becomes aware of any material change in any of the information previously furnished to us, it will promptly advise us of the change.

3.   <u>Company Representations</u>. The Company will:

(i)     Use its best efforts to cause the Company's independent public accountants to address and deliver to the Company and the placement agent a letter or letters (which letters are frequently referred to as "Comfort Letters") dated as of the date of the Closing; and

(ii)    Use its best efforts to cause the Company's counsel to address and deliver to the Company and the placement agent a letter dated as of the date of the Closing and as of the effective date of the Registration Statement containing statements customary for similar transactions and addressing such additional matters as MCF&Co. shall reasonably request. In addition, MCF&Co. shall be entitled to rely on any opinion delivered to the purchasers by counsel to the Company in connection with this transaction.

4.   <u>Scope of Engagement.</u>  The Company acknowledges that we will not make, or arrange for others to make, an appraisal of any physical assets of the candidates.  Nonetheless, if we determine after review of the information furnished to us that any such appraisal or appraisals are necessary or desirable, we will so advise the Company and, if approved by the Company in writing, the costs incurred in connection with such appraisal(s) will be borne by the Company.

MCF&Co. has been engaged by the Company only in connection with the matters described in this letter agreement and for no other purpose. We have not made, and will assume no responsibility to make any representation in connection with our engagement as to any legal matter. Except as specifically provided in this letter agreement, MCF&Co. shall not be required to render any advice or reports in writing or to perform any other services.

5.   <u>Term of Engagement</u>. Our representation on an exclusive basis will continue for a period of 30 days from the date first set forth above, which shall be extended for an additional 45 day period in the event any potential investor identified and introduced by MCF&Co. submits a term sheet to MCF&Co for an investment in the Company. Notwithstanding the foregoing, in the event of termination or expiration of this agreement, MCF&Co.'s retainer and expenses incurred will be payable in full and your obligation under paragraph 6 to pay any applicable Financing Completion Fee will continue for the twenty-four (24) month period commencing with such termination or expiration (the "Tail Period"), with the exception that your obligation under paragraph 6 to pay any applicable Financing Completion Fee with respect to cash paid to the Company upon the exercise of any warrants issued in a Capital Raising Transaction shall continue for the term of the warrant. Notwithstanding the foregoing, no Financing Completion Fee will be payable unless the investor (i) was referred to the Company directly or indirectly by MCF; and (ii) engaged in discussions

Axion Power International, Inc.
November 14, 2007
Page 3

regarding the Capital Raising Transaction with the Company or MCF&Co. during the period that MCF&Co. acted as the Company's exclusive financial advisor under this agreement; and (iii) was not previously engaged in discussions with the Company respecting an alternate financing transaction.

6.    Fees and Expenses.    The Company agrees to pay a cash deposit of $10,000 ("Deposit") against actual out-of-pocket expenses upon execution of this letter agreement and any unused amounts of the Deposit will be returned to the Company promptly upon demand by the Company in writing.    Any expenses exceeding the $10,000 Deposit must be approved in advance in writing by the Company; any such approved out-of-pocket expenses in excess of the Deposit shall be promptly reimbursed to MCF&Co. by the Company. The Company also agrees to reimburse MCF&Co. for any reasonable legal expenses incurred by MCF&Co. for services provided by outside counsel, whether or not a Capital Raising Transaction closes, provided that such expenses shall not exceed $10,000 for professional fees associated with due diligence activities prior to the execution of a term sheet and additional expenses associated with the documentation of a Capital Raising Transaction shall not exceed $20,000 without the prior agreement of the Company. The Company undertakes to use its best efforts to cause its current and former legal counsel, and all other law firms who have previously conducted due diligence investigations on behalf of other investors, to cooperate fully with MCF's counsel in order to minimize duplicative efforts.

7.    Performance-based Compensation.    Performance-based compensation for our services will be as follows:

a.    Capital Raising.

(i)    Financing Completion Fee.    During the term of this agreement (and thereafter as provided in Section 5 above), at the time the Capital Raising Transaction closes, MCF&Co. will be paid a cash Financing Completion Fee equal to 8.0% of the total amount of capital received by the Company from the sale of its securities to investors introduced to the Company by MCF&Co. or from other investors during the time period while MCF&Co. is acting as the Company's financial advisor under this agreement.   The Financing Completion Fee shall also be paid to MCF&Co. with respect to cash paid upon the exercise of any warrants issued in a Capital Raising Transaction; this obligation shall continue for the entire term of the warrants, including, but not limited, to periods after the end of the Tail Period.

(ii)    Warrants.    As part of the Financing Completion Fee, MCF&Co. will receive warrants to purchase common stock in an amount equal to 8.0% of the number of shares of common stock (or common stock equivalents) purchased by investors in a Capital Raising Transaction and that the investors obtain a right to acquire through purchase, conversion, or exercise of convertible securities issued by the Company in a Capital Raising Transaction that closes during the term of this agreement (and thereafter as provided in Section 5 above).   The warrants will be immediately exercisable at the higher of the price per share at which the investor can acquire the common stock or the closing price of the Company's common stock as reported by the appropriate exchange on the date the transaction closes, adjusted for conversion, stock splits or other dilutive events. The warrants will also include piggyback registration rights, a net exercise provision, and will have a term of five years from the closing date of the Capital Raising Transaction.

Case 3:08-cv-02374-MEJ    Document 22-2    Filed 07/22/2008    Page 15 of 21

Axion Power International, Inc.
November 14, 2007
Page 4

8.    **Indemnity and Contribution.**    The parties agree to the terms of MCF&Co.'s standard indemnification agreement, which is attached hereto as Appendix A and incorporated herein by reference. The provisions of this paragraph 7 shall survive any termination of this agreement.

9.    **Other Business.**    If a Capital Raising Transaction closes and the Company is considering an offer of securities to the public at any time within 18 months of the closing date of the Capital Raising Transaction, the Company agrees to offer MCF&Co. the opportunity to act as a co-lead underwriter/book runner role in the transaction. As compensation for any of the foregoing services, MCF&Co. will be paid customary fees to be mutually agreed upon at the appropriate time. The specific terms of any such additional engagements will be set forth in separate letter agreements containing terms and conditions to be mutually agreed upon, including without limitation appropriate indemnification provisions.

The Company further understands that if MCF&Co. is asked to act for the Company in any other formal additional capacity relating to this engagement but not specifically addressed in this letter, such as acting as an underwriter in connection with the issuance of securities by the Company, then such activities shall constitute separate engagements and the terms and conditions of any such additional engagements will be embodied in one or more separate written agreements, containing provisions and terms to be mutually agreed upon, including without limitation appropriate indemnification provisions. The indemnity provisions in Appendix A shall apply to any such additional engagements, unless superseded by an indemnity provision set forth in a separate agreement applicable to any such additional engagements, and shall remain in full force and effect regardless of any completion, modification or termination of MCF&Co.'s engagement(s).

10.    **Other MCF&Co. Activities.**    MCF&Co. is a full service securities firm engaged in securities trading and brokerage activities as well as investment banking and financial advisory services. In the ordinary course of our trading and brokerage activities, MCF&Co. or its affiliates may hold positions, for its own account or the accounts of customers, in equity, debt or other securities of the Company. The Company also acknowledges that MCF&Co. and its affiliates are in the business of providing financial services and consulting advice to others. Nothing herein contained shall be construed to limit or restrict MCF&Co. in conducting such business with respect to others, or in rendering such advice to others, except as such advice may relate to matters relating to the Company's business and properties and that might compromise confidential information delivered by the Company to MCF&Co.

11.    **Compliance with Applicable Law.**    In connection with this engagement, the Company and MCF&Co. will comply with all applicable federal, state and foreign securities laws and other applicable laws.

12.    **Independent Contractor.**    MCF&Co. is and at all times during the term hereof will remain an independent contractor, and nothing contained in this letter agreement will create the relationship of employer and employee or principal and agent as between the Company and MCF&Co. or any of its employees. Without limiting the generality of the foregoing, all final decisions with respect to matters about which MCF&Co. has provided services hereunder shall be solely those of the Company, and MCF&Co. shall have no liability relating thereto or arising therefrom. MCF&Co. shall have no authority to bind or act for the Company in any respect. It is understood that MCF&Co. responsibility to the Company is solely contractual in nature and that MCF&Co. does not owe the Company, or any other party, any fiduciary duty as a result of its engagement.

Axion Power International, Inc.
November 14, 2007
Page 5

13.  <u>Successors and Assigns.</u>  This letter agreement and all obligations and benefits of the parties hereto shall bind and shall inure to their benefit and that of their respective successors and assigns. The indemnity and contribution provisions incorporated into this letter agreement are for the express benefit of the officers, directors, employees, consultants, agents and controlling persons of MCF&Co. and their respective successors, assigns and parent companies.

14.  <u>Announcements.</u>  The Company grants to MCF&Co. the right to place customary announcement(s) of this engagement in certain newspapers and to mail announcement(s) to persons and firms selected by MCF&Co., the whole subject to the Company's prior approval and all costs of such announcement(s) will be borne by MCF&Co.

15.  <u>Governing Law and Arbitration.</u>  This agreement shall be governed by and construed under the laws of the State of California applicable to contracts made and to be performed entirely within the State of California. Any dispute, claim or controversy arising out of or relating to this agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in the City and County of San Francisco, before one arbitrator. The arbitration shall be administered by JAMS. Judgment on the award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Each party will bear its own costs for arbitration. The prevailing party in arbitration shall be entitled to reasonable attorneys' fees. The provisions of this paragraph 14 shall survive any termination of this agreement.

16.  <u>General Provisions.</u>  No purported waiver or modification of any of the terms of this letter agreement will be valid unless made in writing and signed by the parties hereto. Section headings used in this letter agreement are for convenience only, are not a part of this letter agreement and will not be used in construing any of the terms hereof. This letter agreement constitutes and embodies the entire understanding and agreement of the parties hereto relating to the subject matter hereof, and there are no other agreements or understandings, written or oral, in effect between the parties relating to the subject matter hereof. No representation, promise, inducement or statement of intention has been made by either of the parties hereto which is to be embodied in this letter agreement, and none of the parties hereto shall be bound by or liable for any alleged representation, promise, inducement or statement of intention, not so set forth herein. No provision of this letter agreement shall be construed in favor of or against either of the parties hereto by reason of the extent to which either of the parties or its counsel participated in the drafting hereof. If any provision of this letter agreement is held by a court of competent jurisdiction to be invalid, illegal or unenforceable, the remaining provisions hereof shall in no way be affected and shall remain in full force and effect. This letter agreement may be executed in any number of counterparts and by facsimile signature.

Axion Power International, Inc.
November 14, 2007
Page 6

If the foregoing correctly sets forth your understanding of our agreement, please sign the enclosed copy of this letter and return it to MCF&Co.

Very truly yours,

MERRIMAN CURHAN FORD & CO.

By: _____

Gregory S. Curhan
President

The undersigned hereby accepts, agrees to and becomes party to the foregoing letter agreement, effective as of the date first written above.

AXION POWER INTERNATIONAL, INC.

By: _____  11/2/07

Thomas Granville
Chief Executive Officer

Axion Power International, Inc.
November 14, 2007
Page 7

## APPENDIX A - INDEMNIFICATION AGREEMENT

The Company agrees to indemnify and hold harmless MCF&Co. and its officers, directors, employees, consultants, attorneys, agents, affiliates, parent company and controlling persons (within the meaning of Section 15 of the Securities Act of 1933, as amended, or Section 20 of the Securities Exchange Act of 1934, as amended) (MCF&Co. and each such other persons are collectively and individually referred to below as an "Indemnified Party") from and against any and all loss, claim, damage, liability and expense whatsoever, as incurred, including, without limitation, reasonable costs of any investigation, legal and other fees and expenses incurred in connection with, and any amounts paid in settlement of, any action, suit or proceeding or any claim asserted, to which the Indemnified Party may become subject under any applicable federal or state law (whether in tort, contract or on any other basis) or otherwise, (i) arising out of or based upon any untrue statement or alleged untrue statement of a material fact contained in the private placement memorandum, registration statement (including documents, incorporated by reference) (the "Registration Statement") or in any other written or oral communication provided by or on behalf of the Company to any actual or prospective purchaser of the securities or arising out of or based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading or (ii) related to the performance by the Indemnified Party of the services contemplated by this letter agreement (including, without limitation, the offer and sale of the securities) and will reimburse the Indemnified Party for all expenses (including legal fees and expenses) in connection with the investigation of, preparation for or defense of any pending or threatened claim or any action or proceeding arising therefrom, whether or not the Indemnified Party is a party and whether or not such claim, action or proceeding is initiated or brought by the Company. The Company will not be liable under clause (ii) of the foregoing indemnification provision to the extent that any loss, claim, damage, liability or expense is found in a final judgment by a court or arbitrator, not subject to appeal or further appeal, to have resulted directly from the Indemnified Party's willful misconduct or gross negligence. The Company also agrees that the Indemnified Party shall have no liability (whether direct or indirect, in contract, tort or otherwise) to the Company related to, or arising out of, the engagement of the Indemnified Party pursuant to, or the performance by the Indemnified Party of the services contemplated by, this letter agreement except to the extent that any loss, claim, damage, liability or expense is found in a final judgment by a court or arbitrator, not subject to appeal or further appeal, to have resulted directly from the Indemnified Party's willful misconduct or gross negligence.

If the indemnity provided above shall be unenforceable or unavailable for any reason whatsoever, the Company, its successors and assigns, and the Indemnified Party shall contribute to all such losses, claims, damages, liabilities and expenses (including, without limitation, all costs of any investigation, legal or other fees and expenses incurred in connection with, and any amounts paid in settlement of, any action, suit or proceeding or any claim asserted) (i) in such proportion as is appropriate to reflect the relative benefits received by the Company and MCF&Co. under the terms of this letter agreement or (ii) if the allocation provided for by clause (i) of this sentence is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i), but also the relative fault of the Company and MCF&Co. in connection with the matter(s) as to which contribution is to be made. The relative benefits received by the Company and MCF&Co. shall be deemed to be in the same proportion as the fee the Company actually pays to MCF&Co. bears to the total value of the consideration paid or to be paid to the Company and/or the Company's shareholders in the Capital Raising Transaction. The relative fault of the Company and MCF&Co. shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of material fact or omission or alleged omission to state a material fact relates to information supplied by the Company or by MCF&Co. and the Company's and MCF&Co.'s relative intent, knowledge, access to

Axion Power International, Inc.
November 14, 2007
Page 8

information and opportunity to correct.  The Company and MCF&Co. agree that it would not be just or equitable if contribution pursuant to this paragraph were determined by pro rata allocation or by any other method of allocation which does not take into account these equitable considerations. Notwithstanding the foregoing, to the extent permitted by law, in no event shall the Indemnified Party's share of such losses, claims, damages, liabilities and expenses exceed, in the aggregate, the fee actually paid to the Indemnified Party by the Company.  The Company further agrees that, without MCF&Co.'s prior written consent, which consent will not be unreasonably withheld, it will not enter into any settlement of a lawsuit, claim or other proceeding arising out of the transactions contemplated by this agreement unless such settlement includes an explicit and unconditional release from the party bringing such lawsuit, claim or other proceeding of all such lawsuits, claims, or other proceedings against the Indemnified Parties.

The Indemnified Party will give prompt written notice to the Company of any claim for which it seeks indemnification hereunder, but the omission to so notify the Company will not relieve the Company from any liability which it may otherwise have hereunder except to the extent that the Company is damaged or prejudiced by such omission or from any liability it may have other than under this Appendix A.  The Company shall have the right to assume the defense of any claim, lawsuit or action (collectively an "action") for which the Indemnified Party seeks indemnification hereunder, subject to the provisions stated herein with counsel reasonably satisfactory to the Indemnified Party.  After notice from the Company to the Indemnified Party of its election to assume the defense thereof, and so long as the Company performs its obligations pursuant to such election, the Company will not be liable to the Indemnified Party for any legal or other expenses subsequently incurred by the Indemnified Party in connection with the defense thereof other than reasonable costs of investigation.  The Indemnified Party shall have the right to employ separate counsel in any such action and to participate in the defense thereof at its own expense; provided, however, that the reasonable fees and expenses of such counsel shall be at the expense of the Company if (i) the employment thereof has been specifically authorized by the Company in writing, (ii) the Company has failed after a reasonable period of time to assume such defense and to employ counsel or (iii) the named parties to any such action (including any impleaded parties) include both the Indemnified Party and the Company and the Indemnified Party shall have reasonably concluded, based on advice of counsel, that there may be legal defenses available to the Indemnified Party which are different from, or in conflict with, any legal defenses which may be available to the Company (in which event the Company shall not have the right to assume the defense of such action on behalf of the Indemnified Party, it being understood, however, that the Company shall not be liable for the reasonable fees and expenses of more than one separate firm of attorneys for all Indemnified Parties in each jurisdiction in which counsel is needed).  Despite the foregoing, the Indemnified Party shall not settle any claim without the prior written approval of the Company, which approval shall not be unreasonably withheld, so long as the Company is not in material breach of this Appendix A.  Also, each Indemnified Party shall make reasonable efforts to mitigate its losses and liabilities.  In addition to the Company's other obligations hereunder and without limitation, the Company agrees to pay monthly, upon receipt of itemized statements therefore, all reasonable fees and expenses of counsel incurred by an Indemnified Party in defending any claim of the type set forth in the preceding paragraphs or in producing documents, assisting in answering any interrogatories, giving any deposition testimony or otherwise becoming involved in any action or response to any claim relating to the engagement referred to herein, or any of the matters enumerated in the preceding paragraphs, whether or not any claim is made against an Indemnified Party or an Indemnified Party is named as a party to any such action.

# EXHIBIT D

# The Quercus Trust Completes $18 Million Equity Investment in Axion Power



Wednesday, 09 July 2008

Axion Power International, Inc. (OTC: AXPW - News) announced that it has closed the third and final tranche of its previously announced $18 million financing agreement with The Quercus Trust of Newport Beach, California. Yesterday's final closing was a $10 million equity investment and, along with two previous investments of $4 million each announced in January and April, completed the agreement between Axion and Quercus first announced in January. Merriman Curhan Ford and Co. acted as sole placement agent for the transaction.In yesterday's final closing, Quercus bought 4,761,905 additional units for $10 million. Each closing unit will consist of one share of Common Stock and a 5-year warrant to purchase one share of Common Stock at an exercise price of $2.60 per share.

Tom Granville, Axion CEO said, "Quercus' continued commitment to our technology and our capabilities is a testament to the strength of our products and the potential global growth of the commercial battery market. It also shows confidence in the management team that we have put in place and recently strengthened by establishing long term contracts, for the express purpose of maintaining continuity and focus. We are constantly looking to add more superior talent to our team. The Quercus funds will be used to further the development and testing of our exciting new PbC(TM) technology. Our PbC batteries represent a significant advance in the new class of emerging environmentally conscious solutions for global energy issues."Granville continued, "The funds will also be used to retire the final portion of the $2,640,000 December 2007 Bridge loan and in so doing remove the last encumbrance on any of Axion's assets including our IP and all manufacturing and test equipment. Bridge lenders previously converted $335,000 of this loan to equity and now one of Axion's directors is converting an additional $800,000 of this Bridge Loan to equity, showing that he too has faith in our future. All conversions are on the same terms as the Quercus transaction."In conclusion Granville said, "We have adequate funding to take us to the next level and allow us to purchase the automated equipment necessary to produce our proprietary PbC products in commercial quantities. The funding also provides us the ability to both upgrade and purchase new equipment for our standard lead-acid lines, thus enabling us to more efficiently manufacture the battery orders that allowed us to meet the final Quercus funding milestone."
About Axion Power International, Inc.

Axion has developed and patented a next generation energy storage device that won the prestigious 2006 Frost & Sullivan Technology Innovation Award for North America in the field of lead-acid batteries. According to Frost & Sullivan, Axion's new PbC batteries have "the potential to revitalize the lead-acid battery industry by breathing new life into an established technology that was not well-suited to the requirements of important new applications like hybrid electric vehicles and renewable power."

PbC(TM) batteries use sophisticated carbon electrode assemblies to replace the simple lead-based negative electrodes used by other lead-acid battery manufacturers. The resulting device offers energy storage approaching lead acid batteries, coupled with far longer cycle life and power output approaching super-capacitors. These low-cost devices recharge rapidly and are environmentally friendly because they use up to 40 percent less lead. Axion has been producing prototype PbC batteries at its lead-acid battery plant in New Castle, Pennsylvania for more than a year using the same cases, positive electrodes, separators, electrolytes and manufacturing equipment used in its other lead-acid battery lines. The only notable manufacturing difference is the use of Axion's proprietary carbon electrode assemblies instead of lead- based negative electrodes.

Axion believes its PbC technology devices are the only class of advanced battery that can be assembled on existing lead-acid battery production lines without significant changes to production equipment and fabrication processes. It also believes it will be able to manufacture carbon electrode assemblies in volume at low cost using standard production methods that are commonly used in other industries. When its electrode manufacturing methods are fully developed, Axion believes it will be able to sell carbon electrode assemblies as virtual plug and play replacements for the lead based negative electrodes used by all other lead acid battery manufacturers.

Axion's goal is to become the leading supplier of carbon electrode assemblies for the lead-acid battery industry.

Contact:  Allen & Caron        Axion Power International Inc
          www.allencaron.com    www.axionpower.com
          Rudy Barrio (investors)  Kelly Gubish
          Brian Kennedy (media)    724 654 9300
          212 691 8087            kgubish@axionpower.com
          r.barrio@allencaron.com
          brian@allencaron.com

Close Window

# EXHIBIT E

## Debbie

| | |
|---|---|
| **From:** | "Rick Ramirez" <Rickr43@earthlink.net> |
| **To:** | "Tomer Tal" <tomer@newventureattorneys.com> |
| **Sent:** | Saturday, March 29, 2008 4:56 PM |
| **Subject:** | FW: Compensation issues |

Our request to deal with this issue.....peterson/granville

--
Ricardo I. Ramirez
Cypress Avenue Partners, LCC
P.O. Box 8089
Tahoe City, CA 96145
rickr43@earthlink.net
775-691-9335 (o/m)
530-581-3963 fax

Mailing address:
9900 Wilbur May Parkway, #705
Reno, Nevada 89521


------ Forwarded Message
**From:** Rick Ramirez <Rickr43@earthlink.net>
**Date:** Wed, 09 Jan 2008 11:26:32 -0700
**To:** John Petersen <jlp@ipo-law.com>
**Cc:** Tom Granville <tgranville@axionpower.com>
**Conversation:** Compensation issues
**Subject:** Re: Compensation issues


John:

First of all I am saddened to hear of Tom's loss and I hope his health recovers quickly. With respect to the business end of things, I am glad the warrant has been executed. Also, thank you for timely making the $50k cash payment. Regarding the payment for services rendered, I am willing to enter into a non-terminable 12 month contract to provide IR and PR services to the Company. The monthly payment amount is $30,000 per month. This would reflect the $360k I have earned under the proposed revised terms of our original contract. I am willing to extend this out over a 12 month period to be of service to the Company as an accomodation, but the money needs to be wired on the first of each month with no delay. I can either have my attorney prepare such an agreement or you can do so. Regardless of who takes reponsibility for this, this issue needs immediate closure and I need confirmation that this approach is acceptable today.

Rick


On 1/9/08 9:54 AM, "John Petersen" <jlp@ipo-law.com> wrote:

   Rick,

   As I told you in our earlier telephone conversation, Tom Granville is sounding like death warmed over
   and on the run today because of the funeral of his nephew who was assassinated last week in Africa.
   While Tom wants to work out the details personally with you, he has asked me to confirm that Axion:

   1. Has already signed the attached 200,000 share warrant called for in your retainer agreement;
   2. Will, upon closing, pay the $50,000 cash fee called for in Section 3(ii) of your retainer agreement ;
   3. Cannot pay the transaction-based compensation in Sections 3(iii) through 3(v) without running into

problems under both Federal and
California law regarding the payment of commissions to finders; but
4. Would be willing to enter into a reasonable consulting agreement for West Coast PR, IR and BD
relations services of the sort you have been
providing for the last year.

Tom asked me to pass along his apologies for not getting to you directly, but between his illness, dealing
with a due diligence investigation that is more like a proctological examination, and providing emotional
support for family members

------ End of Forwarded Message

EXHIBIT F



1717 Main Street, Suite 3700
Dallas, Texas 75201
214.659.4400 Phone
214.659.4401 Fax
andrewskurth.com

Quentin Collin Faust
214.659.4589 Phone
214.659.4828 Fax
quentinfaust@andrewskurth.com

March 26, 2008

**VIA OVERNIGHT DELIVERY**

James Betts
Betts & Wright
7108 North Fresno Street, Suite 460
Fresno, California 93720

   Re: *Cypress Avenue Partners, LLC / Axion Power International, Inc.*

Dear James:

   Our firm represents Axion Power International, Inc., and we responding to your letter of February 25, 2008, which outlines compensation claims related to an October 9, 2008 letter agreement (the "Agreement"). In essence you outlined three separate compensation related issues, which we will address individually.

   The Warrant. A warrant for 200,000 shares has been issued in the name of Cypress Avenue Partners, LLC, a copy of which is included as an attachment to this letter.

   Fixed Introduction Fee. Axion is not disputing that it closed a financing transaction on January 14, 2008 with the Quercus Trust, nor that Cypress introduced Axion to Merriman Curhan Ford & Co. ("MC&F"), which functioned as the placement agent for the financing. As such Cypress is due the amount of $50,000, as per Section 3(ii) of the Agreement.

   Transaction Based Success Fee. The provisions of Section 3(iii) contemplated a payment based on the percentage of debt or equity raised by a Registered Funding Source. In the first instance, the financing round which closed on January 14, 2008 was for only $4,000,000. The remaining $14,000,000 will only be raised upon the closing of the second and third tranches contemplated under the Agreement. As such, Cypress cannot seriously claim any kind of compensation related to securities which have not been issued, and in fact may not ever be issued. In the first tranche of the financing, Axion issued 1,904,762 shares of its common stock and a warrant for the purchase of up to 2,857,143 additional shares of its common stock. Further, this financing was clearly closed with the assistance of MC&F, who received a fee on the transaction, which such amount would clearly need to be deducted from any amount Cypress would have a right to, pursuant to Section 3(iv) of the Agreement. Finally, we note that the payment of a percentage of the amount of securities that Axion issued to the Quercus Trust to a

James Betts
March 26, 2008
Page 2

person or entity that is not otherwise a licensed broker is not permitted under federal securities law.  Neither Cypress nor Mr. Ramirez were licensed broker dealers at the time the securities were issued, even though they had ample time since the Agreement was entered into to obtain the appropriate licenses to permit them to engage in the business of selling securities for compensation.  As such, we believe the compensation contemplated in Section 3(iii) is void and unenforceable.

Axion has been talking to Mr. Ramirez about appropriate compensation for the fair value of his non-broker activities, but my understanding is that he has not been receptive to any of these suggested compromises. In absence of any such compromise, we believe that the only amount owing to your client is a $50,000 payment and custody of the warrant.

Please feel free to contact me directly at 214-659-4589 if you would like to discuss the matter further.

Very truly yours,

Quentin Collin Faust

cc:    Thomas Granville
       John Petersen

EXHIBIT G

# BETTS & WRIGHT
### A PROFESSIONAL CORPORATION
### ATTORNEYS AT LAW

7108 NORTH FRESNO STREET
SUITE 460
FRESNO, CALIFORNIA 93720

JANET L. WRIGHT
JAMES B. BETTS
JOSEPH D. RUBIN

TELEPHONE
(559) 438-8500
TELEFAX
(559) 438-6959

MAILING ADDRESS:
P.O. BOX 28550
FRESNO, CA 93729

April 1, 2008

Quentin Collin Faust
Andrews Kurth LLP
1717 Main Street
Suite 3700
Dallas, Texas 75201

RE:    Cypress Avenue Partners, LLC/Axion Power International, Inc.

Dear Quentin:

We are in receipt of, and thank you for, your letter of March 26, 2008. Your correspondence provided a response on three points, which I seek to further address.

1.    The Warrant. Your letter had mentioned the warrant was attached. The warrant was not attached. This is symptomatic of the behavior that Axion Power International, Inc. (the "Company") has engaged in for the previous 14 months with my client. Please immediately forward to me the aforementioned warrant.

2.    Fixed Introduction Fee. Since there is no disputing the fact that Cypress Avenue Partners, LLC ("Cypress") is owed $50,000.00 per the agreement between Cypress and the Company, please remit certified funds in the amount of $50,000.00 to our office as soon as possible.

3.    Success Fee. With respect to your claims about Cypress not being due any success fees under the agreement, I must respectfully disagree. Cypress was induced by John Peterson, the Company's chairman and general counsel, to enter into this agreement with the Company. Mr. Peterson, who was also counsel to Mr. Ramirez, had full knowledge that Cypress was not a licensed broker-dealer, yet he induced Cypress to enter into the agreement with the Company because he stood to personally gain from Mr. Ramirez' efforts. He believed that Cypress could ultimately deliver an investor and Cypress did just that. Beyond the ultimate financing success achieved through Cypress and Merriman Curhan Ford & Co ("MFC"), Cypress provided a variety of other services to the Company. It was Mr. Ramirez who acted as the public face for the Company and repositioned what was candidly, a worn out pink sheet company, to an exciting new "clean tech-green tech play" that ultimately drew MCF and the underlying investor. In short, Cypress has clearly earned its fee. It is our further contention that the Company, acting through Mr. Peterson, had never intended to pay Cypress its fee or provide it with any compensation. This reasoning is based on the failure of the Company to deliver the

warrant (which you have acknowledged was due Cypress), the failure to timely make the $50,000 closing payment (which again, you acknowledge is due Cypress) and the failure to work to negotiate any type of post closing compensation with Cypress.

Your assertion that the Company has been willing to work with Cypress is unfounded and inaccurate. In fact, as you will see from the attached e-mail communications, it has been Cypress who has been pro-active in attempting to negotiate a reasonable compromise of the compensation otherwise due to it. As you can see from the e-mail chain, Tom Granville has not even once responded to Rick Ramirez, Manager of Cypress, directly, despite numerous e-mails requesting the compensation issue be resolved. In the attached e-mail dated January 9, 2008, Mr. Ramirez proposed a 12 month, non-cancellable agreement where he would provide business development services to the Company at the rate of $20,000 per month. I am also reattaching a copy of the proposed agreement that was previously submitted to Tom Granville and John Peterson regarding the same. To date, we have received no communications from the Company, or either Messrs. Granville or Peterson regarding the same. To say that Cypress or Mr. Ramirez has not been receptive to resolving this matter is disingenuous, at best.

In the absence of any communication from the Company or Messrs. Granville or Peterson, Mr. Ramirez felt he had no choice but to proceed with litigation to recover the amounts due to him. Based on the responses contained in your letter, compared to the actual facts of what has transpired, I have no choice but to believe this is another attempt by the Company to delay payment or otherwise not pay the amounts owed to Cypress.

In the absence of a mutually agreeable settlement prior to April 4, 2008, substantially along the lines of the revised engagement agreement we had originally submitted to the Company on January 9, 2008, we will have no choice but to seek relief in federal court as stated in our complaint.

While we are willing to settle with the Company and desire to achieve closure on this matter, please be advised that any proposed settlement with the Company must specifically reserve our rights to legally pursue John Peterson for breach of fiduciary duty, professional malpractice and other claims.

I look forward to resolving this matter prior to April 4, 2008.

Very truly yours,

James B. Betts
**BETTS & WRIGHT**

JBB:dm
enclosures



October 5, 2006


**PRIVATE & CONFIDENTIAL**

Thomas Granville
Axion Power International, Inc.
100 Caster Avenue
Woodbridge, Ontario
L-4L 5Y9 Canada


Dear Mr. Granville:

This Agreement (including any attachments, this "**Agreement**") confirms the understanding between Axion Power International, Inc. (the "**Company**" or "**you**") and Ricardo I. Ramirez, acting through Cypress Avenue Partners, LLC ("**CAP**" or "**we**") with regard to the engagement of Mr. Ramirez as the interim Vice President of Business Development to the Company. In his capacity as Interim Vice President of Business Development, Mr. Ramirez will be responsible for locating and closing strategic transactions that result in new sales opportunities, new channels of distribution for the Company's products and additional sources of financing resulting in a more cost efficient operating structure. In connection with these matters, Mr. Ramirez will interface and coordinate with senior management as well the Company's legal counsel, outside bankers and other financiers.

In his capacity as Vice President of Business Development, Mr. Ramirez will take primary responsibility for preparing a Company "book" or memorandum describing the Company and its operations. This memorandum will be distributed by the Company, on an extremely limited confidential basis, to possible qualified, strategic partners that are approved by the Company.

Although Mr. Ramirez is expected to be a valued contributor to the Company, the Board of Directors and shareholders of the Company shall retain control and final decision making with respect to any transactions that result from Mr. Ramirez's business development efforts, including but not limited to control over: (1) strategy and pricing of the transaction or transactions; (2) the structure and form of the transaction(s); (3) the descriptive memorandum and other information presented to potential participants in the transactions; (4) the potential qualified strategic or financial partners to be contacted; (5) the selection of the qualified preferred partners or participants; and (6) the entry into any definitive agreement(s) with those partners or participants.

With respect to any descriptive memorandum put together regarding the Company, the Company shall be responsible for the content of such memorandum, and such memorandum shall be

based exclusively upon infoɪ...tion provided by the Company. The Ⅽompany shall be exclusively responsible for the accuracy and completeness of the descriptive memorandum, and Mr. Ramirez may rely upon the accuracy and completeness of all such information without independent verification.

**Professional Fees & Expenses**

As total compensation for the services we are to provide under the terms of this Agreement, we will be paid a fixed fee of $20,000 per month for a period of 18 months, except as otherwise described below. Two hundred and eighty thousand dollars ($280,000) of this fee shall be deferred until such time as the Company (or any successor to the Company) has consummated a "Significant Transaction" (defined below) and the remaining balance of $80,000 shall be paid to CAP within 4 months following the closing of a "Significant Transaction". In the event that we are not able to assist with the closing of an acceptable Significant Transaction for the Company prior to the end of the 18 month term of this Agreement, and if the Company does not close a Significant Transaction with a party identified, pursued and actually introduced in person to a representative of the Company by CAP as a potential party to a Significant Transaction during the 18 month term of this Agreement or within the 12 month period after the 18 month term, then we hereby waive and the Company shall not owe or otherwise be obligated to pay the deferred portion ("**Deferred Payment**") of our fee described above, provided, however, that if requested by the Company in its sole discretion, in order to be entitled to the Deferred Payment, CAP shall use reasonable efforts to provide the services described herein in connection with such identified Significant Transaction solely for the remaining balance of the original Deferred Payment. In order to confirm the parties to whom CAP actually introduced to the Company as contemplated above, upon the termination of this Agreement for any reason, CAP will deliver to the Company in writing a list of all such parties with whom it arranged and succeeded in introducing to the Company during the 18 month term as contemplated above.

For purposes hereof, a "**Significant Transaction**" shall mean the acquisition of the Company by another person or entity by means of any transaction (including, without limitation, a merger, consolidation or reorganization of the Company with or into another corporation and excluding any sale of stock solely for capital raising purposes), or (b) a sale of all, or substantially all of the assets or the outstanding shares of the Company or (c) the consummation of a transaction or series of transactions in which the Company issues shares or other securities to a third party

Because CAP and Mr. Ramirez will be expending considerable amounts of time pursuing its tasks under this Agreement, and in lieu of the deferment of its compensation, the Company is granting to CAP a warrant to Purchase 200,000 shares of the Company's Common Stock at an exercise of $3.00 per share. A copy of the warrant is attached hereto as Exhibit A.

In addition to the fees that are or may be payable to CAP under this Agreement, CAP's reasonable out-of-pocket expenses actually incurred in connection with its activities under this Agreement will be payable by the Company on a monthly basis provided that CAP will seek the Company's pre-approval of all individual expenses in the event that those individual expenses during the term of this engagement exceed two hundred fifty dollars ($250). Such expenses will include, but not be limited to, costs directly associated with this Agreement, including reasonable attorneys' fees and expenses, travel, out-of-town accommodations and meals, overnight delivery, and database access charges, as well as administrative expenses such as telephone, facsimile, postage, printing and duplication, document materials and similar items. Monthly expenses are payable by the Company upon receipt of an invoice for such expenses from CAP. Notwithstanding

anything else to the contra.    .erein, the total aggregate expenses    . which the Company shall reimburse CAP for hereunder shall not exceed $7,500 per month, without the Company's express prior written approval.

As further consideration for the services provided, the Company agrees to (a) indemnify and hold harmless CAP and its affiliates, and their respective officers, directors, employees, agents, contractors and representatives (CAP and each such entity or person being referred to as an "Indemnified Person"), from and against any and all losses, claims, demands, damages or liabilities of any kind arising out of or in connection with the services provided by CAP hereunder, and (b) reimburse each Indemnified Person for all reasonable costs and expenses (including reasonable fees and disbursements of counsel) incurred by such Indemnified Person in connection with investigating, preparing or defending any investigative, administrative, judicial or regulatory action or proceeding relating to or arising out of the services contemplated by this letter agreement, as such costs and expenses are incurred or paid; except in either case to the extent such losses, claims, demands, damages, liabilities, costs or expenses are finally judicially determined to have resulted primarily from the gross negligence or willful misconduct of CAP. Company also agrees that no Indemnified Person shall have any liability to Company or any of its security holders or creditors arising out of or in connection with the services to be provided under this letter agreement, except to the extent any such liability is finally judicially determined to have resulted primarily from the gross negligence or willful misconduct of such Indemnified Person.

**Information; Confidentiality**

The Company will furnish or arrange to have furnished to CAP such information as CAP believes appropriate to its engagement under this Agreement (all such information so furnished being the "**Information**"). The Company (a) recognizes and acknowledges that CAP (i) will rely on the Information in fulfilling the terms of its engagement under this Agreement without any obligation to independently verify the same, (ii) does not assume responsibility for the accuracy or completeness of the Information or such other information, (iii) has no obligation to undertake an independent evaluation or appraisal of any assets or liabilities of the Company or any other party, (iv) has no obligation to investigate the accuracy or completeness of the Information, and (v) with respect to any financial forecasts (including costs, savings and synergies) that may be furnished to or discussed with us by the Company, will assume that they have been reasonably prepared and reflect the best then-currently available estimates and judgment of the Company's management and (b) consents to each of the items specified in clause (a) of this sentence. The Information will not be audited by CAP and, accordingly, CAP will express no opinion thereon. The Company further agrees to notify CAP promptly of any material change in any Information provided by the Company.

The Company represents that (i) the Information will not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances in which they were made, not be false or misleading, and (ii) the Information will be true, complete and correct in all material respects, provided that this representation and any other representations and warranties of the Company set forth herein do not confer rights upon, and are not intended by the parties to confer rights upon or otherwise be for the benefit of any person not a party hereto.

CAP agrees to keep all Information confidential, except to the extent necessary to perform its duties under this Agreement. Information shall not be considered confidential to the extent that: (a) it is or becomes publicly known through a source other than CAP or its affiliates; (b) it is

independently developed by ..P without reference to the Informatio.. ..(c) it is subsequently learned from a third party who is not under a duty of confidentiality to the Company and that does not otherwise impose an obligation of confidentiality upon CAP; (d) it is required to be disclosed pursuant to applicable laws or regulations, government authority, duly authorized subpoena or court order or directive; or (e) is approved for disclosure by prior written consent of the Company. The obligations of CAP under the immediately preceding two sentences shall terminate upon the third anniversary following the completion of the work contemplated under this Agreement.

**Other Provisions**

The addresses for delivery of all notices to the parties under this Agreement are as follows:

If to the Company:                           If to CAP:

Attn:  Thomas Granville                       Attn: Mr. Ricardo I. Ramirez
Axion Power International, Inc.               Cypress Avenue Partners, LLC
100 Caster Avenue                            PO BOX 8089
Woodbridge, Ontario                          Tahoe City, CA 96145
L-4L 5Y9 Canada

                                             Telephone: 775-691-9335
                                             Facsimile:  530-581-3963


This Agreement constitutes the entire agreement between the Company and CAP, and supersedes any and all prior agreements between the parties relating to this engagement. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby.

The benefits of this Agreement shall inure to the Company, CAP, the Indemnified Parties and their respective successors and assigns and representatives, and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns.

Even though Ricardo I. Ramirez, though CAP, will be acting in the capacity of the Company's interim Vice President of Business Development, CAP shall act as an independent contractor and not an employee of the Company.

If any portion of this Agreement is held to be void, invalid or otherwise unenforceable, in whole or in part, the remaining portions of this Agreement shall remain in effect.

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute the same agreement. In addition, facsimile signatures shall be valid, enforceable, and effective as if they were originals.

This Agreement is binding on the Company and any successors or assigns or affiliated companies controlled by or under common control with the Company which are formed, in whole or in part, for the purpose of accomplishing the transactions contemplated by this Agreement.

This Agreement shall ... governed by, and construed in accordance with, the laws of the state of California applicable to contracts executed in and to be performed in that state.

This engagement is important to us and we appreciate the opportunity to be of service to you. If you are in agreement with the terms set forth herein, please indicate by signing and returning the enclosed copy of this Agreement to us. If you have any questions about this Agreement or wish to discuss these matters further, please contact Ricardo Ramirez at 775-691-9335.

Very truly yours,

CYPRESS AVENUE PARTNERS, LLC

By: _____
Name:  Ricardo I. Ramirez
Title:   Principal

Agreed to and Accepted as of
the date first written above by:
AXION POWER INTERNATIONAL, INC.

By: _____
Name:  Thomas Granville
Title:   President

## Tomer Tal

**From:**     Rick Ramirez [Rickr43@earthlink.net]
**Sent:**     Sunday, March 30, 2008 12:20 PM
**To:**       Tomer Tal
**Subject:**  FW: I finally spoke to Tom

Another response,
--
Ricardo I. Ramirez
Cypress Avenue Partners, LCC
P.O. Box 8089
Tahoe City, CA 96145
rickr43@earthlink.net
775-691-9335 (o/m)
530-581-3963 fax

Mailing address:
9900 Wilbur May Parkway, #705
Reno, Nevada  89521


------ Forwarded Message
**From:** Rick Ramirez <Rickr43@earthlink.net>
**Date:** Tue, 08 Jan 2008 10:43:26 -0700
**To:** John Petersen <jlp@ipo-law.com>
**Conversation:** I finally spoke to Tom
**Subject:** Re: I finally spoke to Tom

john:

I appreciate the follow up. I just can't afford to get screwed over.  A simple email response from Tom would
suffice and would go a long way in defusing  the situation greatly and put my mind at ease.  In the absence of
that, I have to plan for the worst.  Quite frankly, it is because of our relationship that I kick myself for not
 putting on a full court press on this issue early on.

Thanks,


On 1/8/08 10:33 AM, "John Petersen" <jlp@ipo-law.com> wrote:

    I wanted a quick update on our progress.

    He sounds like death warmed over.

    I got off the phone as soon as I heard that Gelbaum's lawyers are talking with Canadian counsel.

    Given the fact that he can't talk without coughing up a lung, I'm not surprised that you haven't
    heard from him.


    John L. Petersen, partner

Fefer Petersen & Cie

Attorneys at Law

Château de Barberêche <http://www.swisscastles.ch/Fribourg/barbereche.html>

Switzerland 1783 Barberêche


+4126-684-0500 Telephone

+4126-684-0505 Facsimile

+4179-308-5181 Cellular


Voicemail and Fax


+1 281-596-4545 Houston

+1 212-401-4750 New York

+33 1 77 72 49 86 Paris


NOTICE: This communication (including attachments) is covered by the Electronic Communication
Privacy Act. U.S.C. Sections 2510-2521, is confidential, may contain privileged information and may be
the subject of certain Confidentiality or Nondisclosure Agreements. If you are not the intended recipient
or believe that you have received this communication in error, please e-mail, fax or telephone the sender
immediately and delete this e-mail communication. Please do not print, copy, retransmit or otherwise
duplicate, disseminate or otherwise use this information.


--
Ricardo I. Ramirez
Cypress Avenue Partners, LCC
9900 Wilbur May Parkway, #705
Reno, Nevada 89521
rickr43@earthlink.net
775-691-9335 (o/m)
530-581-3963 fax

Sent using the Microsoft Entourage 2004 for Mac Test Drive.

------ End of Forwarded Message

## Tomer Tal

| | |
|---|---|
| **From:** | Rick Ramirez [Rickr43@earthlink.net] |
| **Sent:** | Sunday, March 30, 2008 12:22 PM |
| **To:** | Tomer Tal |
| **Subject:** | FW: Compensation issues |

My/our response.

--
Ricardo I. Ramirez
Cypress Avenue Partners, LCC
P.O. Box 8089
Tahoe City, CA 96145
rickr43@earthlink.net
775-691-9335 (o/m)
530-581-3963 fax

Mailing address:
9900 Wilbur May Parkway, #705
Reno, Nevada 89521


------ Forwarded Message
**From:** Rick Ramirez <Rickr43@earthlink.net>
**Date:** Wed, 09 Jan 2008 11:26:32 -0700
**To:** John Petersen <jlp@ipo-law.com>
**Cc:** Tom Granville <tgranville@axionpower.com>
**Conversation:** Compensation issues
**Subject:** Re: Compensation issues

John:

First of all I am saddened to hear of Tom's loss and I hope his health recovers quickly. With respect to the business end of things, I am glad the warrant has been executed. Also, thank you for timely making the $50k cash payment. Regarding the payment for services rendered, I am willing to enter into a non-terminable 12 month contract to provide IR and PR services to the Company. The monthly payment amount is $30,000 per month. This would reflect the $360k I have earned under the proposed revised terms of our original contract. I am willing to extend this out over a 12 month period to be of service to the Company as an accomodation, but the money needs to be wired on the first of each month with no delay. I can either have my attorney prepare such an agreement or you can do so. Regardless of who takes reponsibility for this, this issue needs immediate closure and I need confirmation that this approach is acceptable today.

Rick


On 1/9/08 9:54 AM, "John Petersen" <jlp@ipo-law.com> wrote:

Rick,

As I told you in our earlier telephone conversation, Tom Granville is sounding like death warmed over and on the run today because of the funeral of his nephew who was assassinated last week in Africa. While Tom wants to work out the details personally with you, he has asked me to confirm that Axion:

1. Has already signed the attached 200,000 share warrant called for in your retainer agreement;

2. Will, upon closing, pay the $50,000 cash fee called for in Section 3(ii) of your retainer agreement ;
3. Cannot pay the transaction-based compensation in Sections 3(iii) through 3(v) without running into problems under both Federal and
California law regarding the payment of commissions to finders; but
4. Would be willing to enter into a reasonable consulting agreement for West Coast PR, IR and BD relations services of the sort you have been
providing for the last year.

Tom asked me to pass along his apologies for not getting to you directly, but between his illness, dealing with a due diligence investigation that is more like a proctological examination, and providing emotional support for family members who are stunned by his nephew's death, there simply are not enough hours in the day.


John L. Petersen, partner

Fefer Petersen & Cie

Attorneys at Law

Château de Barberêche <http://www.swisscastles.ch/Fribourg/barbereche.html>

Switzerland 1783 Barberêche


+4126-684-0500 Telephone

+4126-684-0505 Facsimile

+4179-308-5181 Cellular


Voicemail and Fax


+1 281-596-4545 Houston

+1 212-401-4750 New York

+33 1 77 72 49 86 Paris


NOTICE: This communication (including attachments) is covered by the Electronic Communication Privacy Act, U.S.C. Sections 2510-2521, is confidential, may contain privileged information and may be the subject of certain Confidentiality or Nondisclosure Agreements. If you are not the intended recipient or believe that you have received this communication in error, please e-mail, fax or telephone the sender immediately and delete this e-mail communication. Please do not print, copy, retransmit or otherwise duplicate, disseminate or otherwise use this information.


3/30/2008

--
Ricardo I. Ramirez
Cypress Avenue Partners, LCC
9900 Wilbur May Parkway, #705
Reno, Nevada  89521
rickr43@earthlink.net
775-691-9335 (o/m)
530-581-3963 fax

Sent using the Microsoft Entourage 2004 for Mac Test Drive.

------ End of Forwarded Message

# Tomer Tal

**From:**    Rick Ramirez [Rickr43@earthlink.net]
**Sent:**    Sunday, March 30, 2008 12:19 PM
**To:**    Tomer Tal
**Subject:** FW: Compensation issues

My responses.
--
Ricardo I. Ramirez
Cypress Avenue Partners, LCC
P.O. Box 8089
Tahoe City, CA 96145
rickr43@earthlink.net
775-691-9335 (o/m)
530-581-3963 fax

Mailing address:
9900 Wilbur May Parkway, #705
Reno, Nevada 89521


------ Forwarded Message
**From:** Rick Ramirez <Rickr43@earthlink.net>
**Date:** Wed, 09 Jan 2008 11:53:33 -0700
**To:** John Petersen <jlp@ipo-law.com>
**Conversation:** Compensation issues
**Subject:** Re: Compensation issues

John:

A bit rushed as I responded as I am headed out to SF/Peninsula right now.  The total comp reflected under the proposed revisions are 360-50 less leaves 310. Please forward the correction to Tom...

I will be in the car.


On 1/9/08 11:44 AM, "John Petersen" <jlp@ipo-law.com> wrote:

> Rick,
>
> I did not discuss compensation or other terms of the consulting agreement with Tom and obviously have no power to negotiate or agree to anything on behalf of Axion. My function was that of a messenger, nothing more.
>
> I will leave those issues for you two to sort out. I would, however, note that your most recent proposal kicks the total compensation to $410,000 when your starting point a week and a half ago was $360,000.
>
>
> John L. Petersen, partner
>
> Fefer Petersen & Cie
>
> Attorneys at Law


3/30/2008

Château de Barberêche <http://www.swisscastles.ch/Fribourg/barbereche.html>

Switzerland 1783 Barberêche


+4126-684-0500 Telephone

+4126-684-0505 Facsimile

+4179-308-5181 Cellular


Voicemail and Fax


+1 281-596-4545 Houston

+1 212-401-4750 New York

+33 1 77 72 49 86 Paris


NOTICE: This communication (including attachments) is covered by the Electronic Communication Privacy Act, U.S.C. Sections 2510-2521, is confidential, may contain privileged information and may be the subject of certain Confidentiality or Nondisclosure Agreements. If you are not the intended recipient or believe that you have received this communication in error, please e-mail, fax or telephone the sender immediately and delete this e-mail communication. Please do not print, copy, retransmit or otherwise duplicate, disseminate or otherwise use this information.


--
Ricardo I. Ramirez
Cypress Avenue Partners, LCC
9900 Wilbur May Parkway, #705
Reno, Nevada 89521
rickr43@earthlink.net
775-691-9335 (o/m)
530-581-3963 fax

Sent using the Microsoft Entourage 2004 for Mac Test Drive.

------ End of Forwarded Message

3/30/2008

# Tomer Tal

**From:**  Rick Ramirez [Rickr43@earthlink.net]
**Sent:**  Saturday, March 29, 2008 4:56 PM
**To:**  Tomer Tal
**Subject:** FW: Axion/Cypress open itmes

--
Ricardo I. Ramirez
Cypress Avenue Partners, LCC
P.O. Box 8089
Tahoe City, CA 96145
rickr43@earthlink.net
775-691-9335 (o/m)
530-581-3963 fax

Mailing address:
9900 Wilbur May Parkway, #705
Reno, Nevada  89521


------ Forwarded Message
**From:** Rick Ramirez <Rickr43@earthlink.net>
**Date:** Sun, 13 Jan 2008 09:30:14 -0700
**To:** Tom Granville <tgranville@axionpower.com>
**Cc:** John Petersen <jlp@ipo-law.com>
**Conversation:** Axion/Cypress open itmes
**Subject:** Axion/Cypress open itmes

Tom:

Any chance you and I can  hammer out the details listed below.  I  have no interest in negotiating the amount and timing post close A simple acknowledgement (gentlemen's agreement)..so that can move on would suffice. I am available all day to discuss.

--
Ricardo I. Ramirez
Cypress Avenue Partners, LCC
9900 Wilbur May Parkway, #705
Reno, Nevada  89521
rickr43@earthlink.net
775-691-9335 (o/m)
530-581-3963 fax

------ Forwarded Message
**From:** Rick Ramirez <Rickr43@earthlink.net>
**Date:** Wed, 09 Jan 2008 11:26:32 -0800
**To:** John Petersen <jlp@ipo-law.com>
**Cc:** Tom Granville <tgranville@axionpower.com>
**Conversation:** Compensation issues
**Subject:** Re: Compensation issues

John:

First of all I am saddened to hear of Tom's loss and I hope his health recovers quickly. With respect to the business end of things, I am glad the warrant has been executed. Also, thank you for timely making the $50k cash payment. Regarding the payment for services rendered, I am willing to enter into a non-terminable 12 month contract to provide IR and PR services to the Company. The monthly payment amount is $30,000 per month. This would reflect the $360k I have earned under the proposed revised terms of our original contract. I am willing to extend this out over a 12 month period to be of service to the Company as an accomodation, but the money needs to be wired on the first of each month with no delay. I can either have my attorney prepare such an agreement or you can do so. Regardless of who takes reponsibility for this, this issue needs immediate closure and I need confirmation that this approach is acceptable today.

Rick


On 1/9/08 9:54 AM, "John Petersen" <jlp@ipo-law.com> wrote:

Rick,

As I told you in our earlier telephone conversation, Tom Granville is sounding like death warmed over and on the run today because of the funeral of his nephew who was assassinated last week in Africa. While Tom wants to work out the details personally with you, he has asked me to confirm that Axion:

1. Has already signed the attached 200,000 share warrant called for in your retainer agreement;
2. Will, upon closing, pay the $50,000 cash fee called for in Section 3(ii) of your retainer agreement ;
3. Cannot pay the transaction-based compensation in Sections 3(iii) through 3(v) without running into problems under both Federal and California law regarding the payment of commissions to finders; but
4. Would be willing to enter into a reasonable consulting agreement for West Coast PR, IR and BD relations services of the sort you have been providing for the last year.

Tom asked me to pass along his apologies for not getting to you directly, but between his illness, dealing with a due diligence investigation that is more like a proctological examination, and providing emotional support for family members who are stunned by his nephew's death, there simply are not enough hours in the day.


John L. Petersen, partner

Fefer Petersen & Cie

Attorneys at Law

Château de Barberêche <http://www.swisscastles.ch/Fribourg/barbereche.html>

Switzerland 1783 Barberêche


+4126-684-0500 Telephone

+4126-684-0505 Facsimile

+4179-308-5181 Cellular


Voicemail and Fax



3/30/2008

+1 281-596-4545 Houston

+1 212-401-4750 New York

+33 1 77 72 49 86 Paris


NOTICE: This communication (including attachments) is covered by the Electronic Communication Privacy Act, U.S.C. Sections 2510-2521, is confidential, may contain privileged information and may be the subject of certain Confidentiality or Nondisclosure Agreements. If you are not the intended recipient or believe that you have received this communication in error, please e-mail, fax or telephone the sender immediately and delete this e-mail communication. Please do not print, copy, retransmit or otherwise duplicate, disseminate or otherwise use this information.

--
Ricardo I. Ramirez
Cypress Avenue Partners, LCC
9900 Wilbur May Parkway, #705
Reno, Nevada  89521
rickr43@earthlink.net
775-691-9335 (o/m)
530-581-3963 fax

Sent using the Microsoft Entourage 2004 for Mac Test Drive.

------ End of Forwarded Message

Sent using the Microsoft Entourage 2004 for Mac Test Drive.

------ End of Forwarded Message

3/30/2008

# Tomer Tal

**From:**    Rick Ramirez [Rickr43@earthlink.net]
**Sent:**    Sunday, March 30, 2008 12:18 PM
**To:**      Tomer Tal
**Subject:** FW: Compensation issues

My responses.
--
Ricardo I. Ramirez
Cypress Avenue Partners, LCC
P.O. Box 8089
Tahoe City, CA 96145
rickr43@earthlink.net
775-691-9335 (o/m)
530-581-3963 fax

Mailing address:
9900 Wilbur May Parkway, #705
Reno, Nevada 89521


------ Forwarded Message
**From:** Rick Ramirez <Rickr43@earthlink.net>
**Date:** Mon, 14 Jan 2008 08:44:44 -0700
**To:** John Petersen <jlp@ipo-law.com>
**Conversation:** Compensation issues
**Subject:** Re: Compensation issues

Agreed.


On 1/14/08 8:06 AM, "John Petersen" <jlp@ipo-law.com> wrote:

> Rick,
>
> I assured you last week that Tom was going to work out a combination of things that would keep
> you from feeling like you had been left holding an empty bag. Right now he is getting ready to
> sign a contract that says:
> (s) <u>Certain Fees</u>. No brokerage or finder's fees or commissions are or will be payable by the
> Company to any broker, financial advisor or consultant, finder, placement agent, investment
> banker, bank or other Person with respect to the transactions contemplated by this Agreement
> except to Merriman Curhan Ford & Co. (the "Placement Agent"). The Investor shall have no
> obligation with respect to any fees or with respect to any claims (other than such fees or
> commissions owed by the Investor pursuant to written agreements executed by the Investor
> which fees or commissions shall be the sole responsibility of the Investor) made by or on behalf
> of the Placement Agent or any other Persons for fees of a type contemplated in this Section that
> may be due in connection with the transactions contemplated by this Agreement.
> Pushing for an advance agreement that would require renegotiation of this provision would be
> highly problematic. I have never found Tom to be anything less than completely reasonable and
> honorable. Hell, I don't even know what I'm going to make on this transaction. But I'm sure it
> will be fair.
>
> I think you made a good choice in standing by and letting things work themselves out.

3/30/2008

John L. Petersen, partner
Fefer Petersen & Cie
Château de Barberêche
Switzerland 1783 Barberêche

+4126-684-0500 Telephone
+4126-684-0505 Facsimile
+4179-308-5181 Cellular

Voicemail and Fax

+1 281-596-4545 Houston
+1 212-401-4750 New York
+33 1 77 72 49 86 Paris

NOTICE: This communication (including attachments) is covered by the Electronic
Communication Privacy Act, U.S.C. Sections 2510-2521, is confidential, may contain privileged
information and may be the subject of certain Confidentiality or Nondisclosure Agreements. If
you are not the intended recipient or believe that you have received this communication in error,
please e-mail, fax or telephone the sender immediately and delete this e-mail communication.
Please do not print, copy, retransmit or otherwise duplicate, disseminate or otherwise use this
information.

--
Ricardo I. Ramirez
Cypress Avenue Partners, LCC
9900 Wilbur May Parkway, #705
Reno, Nevada  89521
rickr43@earthlink.net
775-691-9335 (o/m)
530-581-3963 fax

Sent using the Microsoft Entourage 2004 for Mac Test Drive.


------ End of Forwarded Message

## Tomer Tal

**From:** Rick Ramirez [Rickr43@earthlink.net]
**Sent:** Saturday, March 29, 2008 4:57 PM
**To:** Tomer Tal
**Subject:** FW: Compensation issues

Memo to peterson
--
Ricardo I. Ramirez
Cypress Avenue Partners, LCC
P.O. Box 8089
Tahoe City, CA 96145
rickr43@earthlink.net
775-691-9335 (o/m)
530-581-3963 fax

Mailing address:
9900 Wilbur May Parkway, #705
Reno, Nevada 89521


------ Forwarded Message
**From:** Rick Ramirez <Rickr43@earthlink.net>
**Date:** Mon, 14 Jan 2008 07:19:37 -0700
**To:** John Petersen <jlp@ipo-law.com>
**Conversation:** Compensation issues
**Subject:** FW: Compensation issues

John:

I am assuming that I will be treated fairly and look forward to wrapping this up shortly.   I am taking this memo and your representations that Tom will approach my efforts and work on behalf of the company with a high degree of integrity to get to a fair resolution.

On Stirling, we are moved the meeting to the offices of Greenberg mid week, and given the momentum, the activity level will pick up significantly.

I am available after 10:00 AM this morning as I have some logistics issues to run by you.
-

Rick,

As I told you in our earlier telephone conversation, Tom Granville is sounding like death warmed over and on the run today because of the funeral of his nephew who was assassinated last week in Africa. While Tom wants to work out the details personally with you, he has asked me to confirm that Axion:

1. Has already signed the attached 200,000 share warrant called for in your retainer agreement;
2. Will, upon closing, pay the $50,000 cash fee called for in Section 3(ii) of your retainer agreement ;
3. Cannot pay the transaction-based compensation in Sections 3(iii) through 3(v) without running into problems under both Federal and
California law regarding the payment of commissions to finders; but
4. Would be willing to enter into a reasonable consulting agreement for West Coast PR, IR and BD relations services of the sort you have been
providing for the last year.

Tom asked me to pass along his apologies for not getting to you directly, but between his illness, dealing with a due diligence investigation that is more like a proctological examination, and providing emotional support for family members who are stunned by his nephew's death, there simply are not enough hours in the day.

John L. Petersen, partner

Fefer Petersen & Cie

Attorneys at Law

Château de Barberêche <http://www.swisscastles.ch/Fribourg/barbereche.html>

Switzerland 1783 Barberêche


+4126-684-0500 Telephone

+4126-684-0505 Facsimile

+4179-308-5181 Celluiar


Voicemail and Fax


+1 281-596-4545 Houston

+1 212-401-4750 New York

+33 1 77 72 49 86 Paris


NOTICE: This communication (including attachments) is covered by the Electronic Communication Privacy Act, U.S.C. Sections 2510-2521, is confidential, may contain privileged information and may be the subject of certain Confidentiality or Nondisclosure Agreements. If you are not the intended recipient or believe that you have received this communication in error, please e-mail, fax or telephone the sender immediately and delete this e-mail communication. Please do not print, copy, retransmit or otherwise duplicate, disseminate or otherwise use this information.


------ End of Forwarded Message

Sent using the Microsoft Entourage 2004 for Mac Test Drive.

------ End of Forwarded Message


3/30/2008

## Tomer Tal

**From:**     Rick Ramirez [Rickr43@earthlink.net]
**Sent:**     Saturday, March 29, 2008 5:00 PM
**To:**       Tomer Tal
**Subject:**  FW: Axion follow up


--
Ricardo I. Ramirez
Cypress Avenue Partners, LCC
P.O. Box 8089
Tahoe City, CA 96145
rickr43@earthlink.net
775-691-9335 (o/m)
530-581-3963 fax

Mailing address:
9900 Wilbur May Parkway, #705
Reno, Nevada 89521


------ Forwarded Message
**From:** Rick Ramirez <Rickr43@earthlink.net>
**Date:** Fri, 18 Jan 2008 11:18:56 -0700
**To:** Tom Granville <tgranville@axionpower.com>
**Cc:** John Petersen <jlp@ipo-law.com>
**Conversation:** Axion follow up
**Subject:** Axion follow up

Tom:

Had a nice closing breakfast with Greg yesterday morning to thank him for getting us in front of Gelbaum and pulling off the funding. According to Greg, he was instructed by Gelbaum that he was not looking or funding new deals for at least six months in order to digest and staff the management of the deals in play.   In fact, Greg mentioned that Gelbaum's idiosyncratic style had him on the edge of every transaction. He literally said he never knew what little detail would throw him off.  A little side bar...... now that the dust has settled for the moment, I would like to wrap up our end of things the least of which are my out of expenses, warrant agreement and last but not least the compensation for work performed on behalf of the company.

I am not sure why you have gone radio silent on this issue given that I have been an incredible advocate for the company when there was little to work with, incredibly lenient and did not push the company for my out of pocket expenses to be reimbursed and lastly did exactly what I was tasked to do.

I would appreciate the courtesy of a phone call or an email at your earliest convenience.

Regards,


--
Ricardo I. Ramirez
Cypress Avenue Partners, LCC
9900 Wilbur May Parkway, #705
Reno, Nevada 89521
rickr43@earthlink.net

775-691-9335 (o/m)
530-581-3963 fax

Sent using the Microsoft Entourage 2004 for Mac Test Drive.

------ End of Forwarded Message